COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present:  Judges Beales, Friedman and Callins
Argued at Richmond, Virginia


THE MANORS LLC AND
 DARRICK HARRIS

                                                                    OPINION BY
v.        Record No. 0513-22-2                         JUDGE DOMINIQUE A. CALLINS
                                                                  FEBRUARY 28, 2023

BOARD OF SUPERVISORS OF
 ALBEMARLE COUNTY


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

Evan D. Mayo (Susan P. Keaton; Tremblay & Smith, PLLC, on
briefs), for appellants.

Andrew H. Herrick, Deputy County Attorney (Susan Baumgartner,
Senior Assistant County Attorney, on brief), for appellee.


In 2016, Darrick Harris bought a run-down, two-acre property on Northfield Road in

Albemarle County. After making substantial improvements to the property, Harris applied for a

homestay special exception that would allow him to rent out five guest rooms from the main house.

The Albemarle County Board of Supervisors denied his request, and Harris appealed to the Circuit

Court of Albemarle County. The circuit court affirmed the Board's decision, and Harris appealed to

this Court. Harris argues that the homestay special exception ordinance is unconstitutionally vague

and that the circuit court erred when it interpreted that ordinance. He also argues that the Board

erred by denying his application for a special exception permit. We affirm the judgment of the

circuit court.

BACKGROUND[1]

Albemarle County's zoning code currently permits "homestays" where the homeowner lives on-site and rents out individual rooms, usually on a short-term basis. At the relevant time, the zoning code allowed homeowners like Harris to rent out two guest rooms on their property as of right. Albemarle County, Va., Ordinance No. 19-18(6) (Aug. 7, 2019). The ordinance also provided that the Board may grant special exception requests to host up to five guest rooms after providing notice to the abutting property owners "upon consideration of the following: (i) There is no detriment to any abutting lot; and (ii) There is no harm to the public health, safety, or welfare." *Id.* After renovating the property on Northfield Road, Harris applied for a special exception to use the property as a homestay, but without the owner living on-site. This arrangement is not allowed by the County's zoning code, and Harris withdrew his request. He then submitted another special exception request, this time pursuant to the zoning code, requesting permission to rent out five guest rooms while living on the property.

After Harris submitted his request, the Board's staff ("the staff") reviewed it and composed a "staff analysis" document packet for the Board to review. As part of that process, the staff reviewed 28 public comments that the Board had received in response to Harris's first special exception request. Two of those comments supported the special exception, and the rest were opposed. Only one comment was from an abutting homeowner, who opposed the special exception. The neighbors' concerns, aside from concern about whether the homeowner would live on-site, fall into four main categories: (1) the large house and garage are aesthetically out of character with the surrounding neighborhood; (2) the proposal is essentially a "small hotel" and a party house, which is out of character with the neighborhood; (3) the homestay will increase traffic and

---

[1] "On appeal, we review the facts in the light most favorable to the prevailing party at trial." *Sugarland Run Homeowner's Ass'n v. Halfmann*, 260 Va. 366, 371 (2000).

parking problems; and (4) granting the special exception will set a precedent that allows residential neighborhoods to be overcome by homestay and short-term rental properties.

In response, Harris mainly argued that the first concern is limited by the presence of another new, large house in the neighborhood. He also argued that the other concerns are mitigated by the fact that he lives on the property. He stated that the homestay will be a residential property with "occasional guests," that there is adequate parking, and that the guests can access the property from the rear via Rio Road, reducing the traffic on Northfield Road.

After considering the request, the staff found three factors in favor of granting the request. First, the nearest homes are 60, 150, and 280 feet away from the proposed homestay. Second, the property is "uniquely situated" near a large, nonresidential church and other properties with similar sizes and scale. Third, the property is fenced and will be gated, which will provide privacy to the neighbors. The staff also noted that approving special exceptions does not create binding precedent.

The staff reported two factors against granting the request. First, the area is residential and not recommended for commercial/tourism development in the master plan. Second, the number of homestay rooms requested is not in character with the surrounding neighborhood. The staff ultimately recommended that the Board should deny the request because the increase in rooms "could result in additional activity on the property that could impact abutting neighbors." Namely, the staff was concerned about noise, traffic, and outdoor activity.

After the staff submitted their analysis, the Board held a hearing and debated the request. One Board member expressed a belief that a special exception would be appropriate for houses on 10-20 acre lots. Another Board member insisted that the intensity of the proposed use was too high for the residential area. Conversely, other Board members contended that the property was big enough to "totally accommodate" the proposal and that the location was unique enough to

allow this use; although one supporter of the special exception grant expressed concern about the precedent set by granting this application.

The Board also discussed the community's concerns about the house being used for parties. A Board member said that she had once been invited to a party at another short-term rental property that Harris owns through an LLC. She took a bus to the party and, when she arrived, she saw that the neighbors were unhappy about the party. After sharing the story, the Board member admitted that the other property was separate from the application before them. Although a different member commented that the story was "very powerful" in explaining some concerns, the other property was not mentioned again. The Board members noted that parties are not limited to short-term rentals or homesteads and that refusing the special exception would not mean that parties may not be hosted on the site. They also noted that Harris is permitted two guest rooms by-right. Ultimately, four members of the Board voted to deny the special exception request and two members voted to approve it.

Harris appealed that decision to the Circuit Court of Albemarle County. He largely argued that granting the special exception would not harm the public health, safety, or welfare, nor cause detriment to abutting landowners. Thus, he contended that the Board was required to grant his request. At trial, Harris testified about the history of the property and discussed the work that he did to encourage the Board to grant his request, including soundproofing the buildings and installing a privacy fence around the property. He also called Rebecca Ragsdale, principal planner in Albemarle County's zoning division, as a witness. She testified to the process her office uses in evaluating permits: "[G]enerally-speaking, character of the area is something that I as a professional would include as part of an analysis . . . for any type of land use application." When asked about the public health, safety, and welfare, she stated that her analysis focused on the abutting lots. She also testified that she believed the character of the

neighborhood was considered as part of the public welfare. On cross-examination, Ragsdale noted that, by definition, a dwelling with six or more guest rooms is a hotel.

For its case-in-chief, the County called Bart Svoboda, the director of zoning and the zoning administrator for Albemarle County. Svoboda also presented Harris's special exception request to the Board during its hearing. At trial, he testified to the history of the property and reviewed the staff's analysis of the property. He testified that, in considering the request, the staff considered the detriment to abutting lots by looking at the potential for noise, the size of the homestay, and visual screening between the property and the abutting lots. Svoboda also testified that the staff considered the definition of public welfare to include noise, visuals, and traffic. When asked specifically about the staff's recommendation to deny the exception, Svoboda answered, "The health, safety, welfare of the community, the area, from staff's analysis, I don't want to say it was in jeopardy, but it would have changed the character of the area." On cross-examination, Svoboda admitted that the staff found granting the exception "could" cause detriment to abutting property owners and admitted that staff used estimates to reach that conclusion.

The circuit court ultimately issued a written opinion ruling in favor of the County. That opinion noted that the property in question is in a quiet neighborhood and that increased noise and traffic was a valid concern for the neighborhood. This appeal timely followed.

ANALYSIS

*I. Interpretation of the Ordinance*

The Albemarle County ordinance that regulated homestays permitted a maximum of two guest rooms by-right. Albemarle County, Va., Ordinance No. 19-18(6) (Aug. 7, 2019). It also permitted three additional guest rooms if the homeowner is approved for a special exception. *Id.* In relevant part, subsection (i)(2) of the ordinance provided:

> Special exceptions may be granted after notice to abutting property owners upon consideration of the following: (i) There is no detriment to any abutting lot; and (ii) There is no harm to the public health, safety, or welfare.

*Id.*[2]

### a. The definition of "public welfare" includes the character of the neighborhood.

Harris argues that the ordinance limited the Board to consideration of the two enumerated factors and that the circuit court acted improperly by allowing the Board to consider the character of the neighborhood as a component of "the public welfare." Whether a lower court properly interpreted statutory terms is a purely legal question which this Court reviews de novo. *See Eley v. Commonwealth*, 70 Va. App. 158, 162 (2019). When a statute is unambiguous, we must apply the plain meaning of the terms because we assume that the County "chose, with care, the words it used." *Id.* at 163 (quoting *Doulgerakis v. Commonwealth*, 61 Va. App. 417, 420 (2013)). But, where applicable, "[s]tatutes must be construed consistent[ly] with each other and so as to reasonably and logically effectuate their intended purpose." *Nelson v. County of Henrico*, 10 Va. App. 558, 561 (1990). When necessary, we also harmonize statutes with related statutes. *Atl. Orthopedic Specialists v. City of Portsmouth*, 73 Va. App. 157, 165 (2021).

Harris asserts that we must adopt a narrow version of "welfare" that only includes considerations related to food, water, light, shelter, space, and medical treatment. The Board urges us to adopt the circuit court's finding that "welfare" includes enjoyment of the neighborhood and quality of life, which relate to noise and the character of the neighborhood.

The statutory scheme behind the ordinance is instructive. Local ordinances must derive their authority from a validly enacted state law. *See City of Richmond v. Confrere Club of*

---

[2] In the time since Harris's special exception request was denied, the County has updated its procedure for evaluating special exception requests for homestays. *See* Albemarle County, Va., Ordinance No. 22-18(2) (Apr. 6, 2022); Albemarle County, Va., Ordinance § 18-5.1.48(d).

*Richmond, Inc.*, 239 Va. 77, 79 (1990). Here, the enabling statute is Code § 15.2-2280, which empowers localities to enact zoning ordinances. In conjunction is Code § 15.2-2283, which describes the purposes that zoning ordinances may further. This statute directs that "[z]oning ordinances shall be for the general purpose of promoting the health, safety or general welfare of the public" and lists twelve purposes that may be considered by municipalities when enacting zoning ordinances. Code § 15.2-2283. These purposes include facilitating the creation of a "convenient, attractive and harmonious community" and "reduc[ing] or prevent[ing] congestion in the public streets." *Id.*

This means that under Code § 15.2-2283, creating convenient, attractive, and harmonious communities is a component of the public health, safety, and welfare. And because Code § 15.2-2283 is part of the statutory enabling scheme for the ordinance at issue here, it follows that the same definitions should be used in the statute and the ordinance. It is logical to interpret ordinances consistent with their enabling schemes. *Cf. Nelson*, 10 Va. App. at 561 (holding that "[s]tatutes must be construed consistent[ly] with each other and so as to reasonably and logically effectuate their intended purpose"); *Atl. Orthopedic Specialists*, 73 Va. App. at 165 ("[P]roper construction seeks to harmonize the provisions of a statute . . . in relation to other statutes." (quoting *McGowan v. Commonwealth*, 72 Va. App. 513, 518 (2020))).

It is clear that when zoning administrators consider the character of the area as part of their analysis, that consideration falls within the umbrella of their duty to create convenient, attractive, and harmonious communities. Thus, when the Board and their staff considered the character of the area, they properly considered it as part of the public welfare. We reject Harris's

argument that the Board strayed outside the enumerated factors by considering the character of the neighborhood.[3]

### b. The ordinance is constitutional.

Harris also argues that this definition of the "public welfare" renders the ordinance unconstitutionally vague. He contends that the statute's reference to "general welfare" does not put landowners on notice that the Board may consider the character of the neighborhood when considering special exception requests.

In zoning, an ordinance may be necessarily vague "where it is difficult or impracticable to lay down a definite rule, or where the discretion relates to the administration of a police regulation and is necessary to protect the public morals, health, safety and general welfare." *Helmick v. Town of Warrenton*, 254 Va. 225, 232 (1997) (quoting *Gorieb v. Fox*, 145 Va. 554, 563-64 (1926)) (considering an ordinance that allows the locality to vacate plats "in accordance with . . . the Code of Virginia"). The proper question is whether "the statutes and the zoning ordinance involved here contain sufficient guidelines to enable the governing body of [Albemarle] County to exercise effectively its legislative function of granting or denying use permits under the ordinance." *Byrum v. Bd. of Supervisors of Orange Cnty.*, 217 Va. 37, 44 (1976) (considering an ordinance that divides a locality into six districts "for the purpose of promoting health, safety, order, prosperity, the conservation of natural and historic resources, and the general welfare requiring it").

Because zoning decisions are dependent on local need and require local expertise, it is difficult for localities to establish uniform standards. *Helmick*, 254 Va. at 233. *Byrum* establishes three factors to consider when determining whether a zoning ordinance is

---

[3] Because we conclude that the Board considered information within the enumerated factors, we need not address Harris's contention that the ordinance limited the Board's consideration to only those factors.

- 8 -

constitutional. 217 Va. at 41-42. All three factors are met here. First, and most importantly, the Board is prohibited from acting in an arbitrary, capricious, or unreasonable manner and its decisions are subject to judicial review. *See id.* at 41. Second, the Albemarle County Code and the Virginia Code provide purposes that must guide the Board's decision. *See id.*; *see also* Code § 15.2-2283; Albemarle County, Va., Ordinance § 18-1.4 (listing the purposes of zoning ordinances). Last, the Board did not attempt to delegate its legislative powers to an administrative agency, so it was not required to promulgate rules for considering permits. *See Byrum*, 217 Va. at 42. There is no reason for us to stray from the rules articulated in *Byrum* and affirmed in *Helmick*. The Albemarle County ordinance is constitutional.

## II. *The Board's Decision*

Harris argues that the Board wrongly considered information outside the enumerated factors when deciding to deny the special exception. And, thus, he asserts that the Board's decision was unsupported by the evidence.

Granting or denying a special exception is a legislative action, which courts review under the "fairly debatable" standard. *Cnty. Bd. of Arlington v. Bratic*, 237 Va. 221, 227 (1989). "A legislative act involves the 'balancing of the consequences of private conduct against the interests of public welfare, health, and safety.'" *Helmick*, 254 Va. at 229 (quoting *Bd. of Supervisors of Fairfax Cnty. v. Southland Corp.*, 224 Va. 514, 522 (1982)). We presume that all legislative acts are reasonable. *Bratic*, 237 Va. at 227. But if a petitioning property owner presents "probative evidence of unreasonableness," he defeats that presumption. *Id.* A board then bears the burden to present evidence that the decision was reasonable. *Id.* If that evidence shows that the decision was at least "fairly debatable," then the legislative act is valid and must be upheld. *Id.* A decision is fairly debatable if "the evidence offered in support of the opposing

views would lead objective and reasonable persons to reach different conclusions." *Id.* (quoting

*Bd. of Supervisors of Fairfax Cnty. v. Jackson*, 221 Va. 328, 333 (1980)).

As explained in *Bratic*:

> The question is not merely whether the refusal to [grant a use permit] is unreasonable. Rather, the more precise inquiry is whether the landowner or the legislative body has the right to select the [use] when the [use permitted by right] and the proposed [use] are both reasonably [appropriate for] the subject property. To pose the question is to answer it.

> When, as here, the [use permitted by right] and the [proposed use] are both appropriate for the lot in question, a classic case of a "fairly debatable" issue is presented. Under such circumstances, it is not the property owner, or the courts, but the legislative body which has the prerogative to choose the [appropriate use].

*Id.* at 229 (alterations in original) (quoting *Jackson*, 221 Va. at 335).

Harris advances several arguments in support of his contention that the Board acted unreasonably. First, he argues that the Board holds the burden to prove that granting his special exception request would not cause harm to the public health, safety, or welfare, nor would it cause detriment to abutting landowners. He then argues that the Board should not have considered the public comments and that no evidence supported the Board's decision to deny the special exception request.

*a. The burden of proof is on the property owner.*

As a preliminary matter, Harris misunderstands the burden of proof before the Board. Harris suggests that the Board was required to hear expert testimony on the character of the neighborhood and neighboring property values before denying the application on those grounds. But it is not the Board's responsibility to marshal such evidence. The Board did not have the burden to prove that Harris's suggested use was unreasonable. Rather, Harris had the burden of persuading the Board to grant him a special exception to use his land in a manner that was not entitled.

The Board, not this Court, is charged with choosing the appropriate use for land in Albemarle County. *See id.* When the Board enacted a zoning scheme that allowed two homestay guest rooms by-right and three more upon approval of a special exception, the Board was exercising its valid zoning powers. *See* Code §§ 15.2-2280, -2310. The language in the ordinance states that the Board "may" grant a special exception if the two enumerated factors are met. In this context, the word "may" connotes a choice or possibility afforded the Board. In other words, it is the Board to whom the option of factors is presented for consideration. Thus, the Board is not bound to ensure that the enumerated factors are met before it may deny a special exception. *See Byrum*, 217 Va. at 41 (reviewing a special exception ordinance and concluding that the use of the word "may" "indicates an intent by the Board to reserve to itself a large measure of discretion"). And as the Board is not bound to ensure that the factors are met, it cannot be under a duty to marshal the evidence that ensures the factors are met. Rather, the applicant bears the burden of assembling sufficient proof that granting the special exception request does not cause detriment to any abutting lot or harm to the public health, safety, or welfare.

This conclusion is further supported by the Board's role in the special exception process. Under *Bratic*, the legislative body, not the petitioning property owner, has the prerogative to choose between appropriate uses. 237 Va. at 229. Requiring the Board to prove that a certain use is inappropriate before it may deny a special exception request would contravene the balance of power articulated in *Bratic*. Instead, where a property owner wants a certain applicable use, the burden must fall to the property owner to prove to the Board that the requested use is appropriate.

*b. The Board is entitled to weigh the evidence before it.*

As the local governing body, we may presume that the Board is familiar with its locality and the locality's needs. *See Byrum*, 217 Va. at 39. Despite Harris's argument that the Board should have called expert witnesses, knowledge of neighborhoods and property values is not limited to expert witnesses and realtors, so there is no reason the Board could not have relied on its staff's assessment and its own knowledge of the area. Similarly, we may assume that homeowners in the locality are familiar with their own neighborhood and property values. In this case, those homeowners submitted public comments that could bear on the question of the public welfare.

Those public comments were submitted in response to Harris's request for a homeowner occupancy exception, and the staff transferred them to the request for additional guest rooms. Harris argues that the staff should not have transferred the comments and the Board should not have been permitted to consider the comments. We disagree. That the comments responded to an earlier version of the request may diminish the comments' value to the Board, but that fact alone does not lead us to conclude that the Board should not have been able to review the comments.

Harris is correct that some comments were specific to the homeowner occupancy request and irrelevant to the final request. But to react to this by screening such comments from the Board would be overbroad. As our Supreme Court has recently noted, "It is not only proper but even expected that a legislat[ive body] and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all other legislative matters." *Loch Levan Land Ltd. P'ship v. Bd. of Supervisors of Henrico Cnty.*, 297 Va. 674, 692 (2019) (alteration in original) (quoting *AT&T Wireless PCS v. City Council of Va. Beach*, 155

F.3d 423, 430-31 (4th Cir. 1998)). When a public comment holds some value for Board decisions, we will not be quick to remove those comments from the Board's consideration.

The Board has the right to create its own procedures, and a reviewing court owes the Board a presumption of reasonableness. Code § 15-2310 (charging local bodies with creating their own special exception procedures); *Bratic*, 237 Va. at 227 (recognizing that all legislative acts are presumed reasonable). In that light, we trust that the Board can weigh public comments appropriately and only consider the portions of the public comments relevant to the request at hand. And the evidence does not suggest that the Board considered any portion of the comments that was not relevant to the request before it. The concerns articulated by the Board primarily related to the size and scale of the homestay, the primary issue in the final special exception request.

In sum, the Board had a right to consider the public comments as it saw fit. Between the public comments, the special exception request documents, and the Board's knowledge about zoning matters, there was sufficient evidence before the Board to raise its concerns about noise, traffic, and the character of the neighborhood.

### c. The decision was fairly debatable.

To the extent that Harris argues the denial was unreasonable or arbitrary, he argues the neighborhood was not, as the public comments assert, quiet, private, and residential. But we, sitting in appellate review, are not the factfinder on that point. We will not substitute our own judgment for the local legislative body's. *Byrum*, 217 Va. at 39. We assume that the Board is familiar with the locality and its needs, and we defer to its knowledge of local conditions and communities. *See id.* Moreover, in deference to the circuit court, we review the facts in the light most favorable to the prevailing party and we assume that the circuit court's judgment is correct.

*Sugarland Run Homeowner's Ass'n v. Halfmann*, 260 Va. 366, 371 (2000). We will only overrule the circuit court if its ruling is plainly wrong or without evidence to support it. *Id.*

For us to find that the character of the neighborhood was not quiet would require that we usurp the circuit court's factfinding role and substitute our own judgment for the Board's judgment. The circuit court found that the property in question is in a quiet neighborhood and that increased noise and traffic was a valid concern for the neighborhood. Based on these specific findings about the neighborhood, the circuit court found that the Board's decision was supported by the evidence and not unreasonable. That was clearly not error. The public comments, the staff report, and the testimony at trial support this conclusion. Thus, even if we accept Harris's argument that he introduced probative evidence of unreasonableness, we must still affirm the circuit court's judgment that the decision whether to grant the special exception was at least "fairly debatable." *See Bratic*, 237 Va. at 227 ("If . . . evidence of reasonableness is sufficient to make the issue fairly debatable, the legislative action must be sustained . . . ." (quoting *Jackson*, 221 Va. at 333)).

CONCLUSION

The record shows that the Board considered the factors in favor and against granting Harris's special exception request. It ultimately concluded that granting the special exception would cause harm to the public welfare. Under the ordinance, this was reasonable cause to deny the request. Because Harris failed to meet his burden to show that his desired land use would not cause harm to the public welfare, the Board denied his request and Harris is limited to the

property uses permitted by-right.[4]  For the reasons stated above, we affirm the judgment of the circuit court.

*Affirmed.*

---

[4] As his second assignment of error, Harris argues that the Board was required to grant his special exception request because there was no evidence of harm to abutting lots.  We reject this argument because the ordinance allows the Board to grant special exceptions only when *both* factors in the ordinance are met.  *See* Albemarle County, Va., Ordinance No. 19-18(6) (Aug. 7, 2019) (using the conjunctive word "and" to join the two factors).  After determining that Harris did not meet his burden for the second factor, the Board was not required to consider any potential harm to abutting lots.